22 Ariz. App. 183 (1974)
525 P.2d 949
The CIVIL SERVICE COMMISSION OF the CITY OF TUCSON, Paul Miner in his capacity as Secretary to the Civil Service Commission of the City of Tucson and as Personnel Director of the City of Tucson, and William Gilkinson, Chief of the City of Tucson Police Department, Appellants and Cross-Appellees,
v.
Marv Davis LIVINGSTON, Appellee and Cross-Appellant.
No. 2 CA-CIV 1545.
Court of Appeals of Arizona, Division 2.
August 19, 1974.
Rehearing Denied September 18, 1974.
Review Denied October 8, 1974.
*184 Cusick, Watkins, Stewart & Harris by Hugh W. Stewart, Tucson, for appellants and cross-appellees.
Barry M. Corey, Tucson, for appellee and cross-appellant.
OPINION
HOWARD, Judge.
The appellee, a member of the City of Tucson Police Department, was charged with violating three departmental regulations, to-wit § 6-8.401(7), conduct unbecoming an officer; § 6-12.102, unauthorized wearing of the police uniform; and § 6-6.305, unauthorized leaving of assigned area. The specifications to the charges read as follows:
"6-8.401(7)
Officer Livingston, in the company of two other officers, visited the residence of 2454 East Mountain View, on or about June 25, 1972, for the purpose of engaging in a licentious and morally unacceptable party terminating in sexual intercourse between Livingston and a female by the name of Manuella [sic] Luna. At the time of this party and sexual relationship, Livingston was fully aware that Manuella [sic] Luna and other females present were employed as nude models, and quite probably prostitutes, at Nik's Fliks and Chiks (an adult theater of known disrepute at 4557 South 6th Avenue). Knowledge of this occurrence was brought to the attention of the Department during an investigation conducted by Mr. Alex Dressler, a reporter for the Arizona Daily Star, and Sergeant T. Kehoe of the South Tucson Police Department. Possession of this information by the newspaper and other official agencies places the Department in a position of great embarrassment. Officer Livingston had, in fact, been previously warned by a fellow officer as to the nature of loose moral character of the females involved at the party.
6-12.102
On or about June 25, 1972, Officer Livingston attended the aforementioned party wearing the uniform trousers and issue footgear easily recognizable as a portion of the official uniform of the Tucson Police Department.
6-6.305
On or about June 25, 1972, Officer Livingston absented himself from his assigned area without proper authorization by his supervising officer. In so doing, he left his area of responsibility unprotected and violated standing instructions from his Squad Sergeant, L. Erdman # 142."
"Nik's Fliks" is known as a "hard core porno house". The girls working there are called "models". A person can "rent" a model at the business establishment and take her into a private room on the premises. There the "client" can body paint the nude model whom he has "rented" or take pictures of her in any position he desires. The models can also be rented on a "take out" basis. Pornographic movies are shown on the premises; also, various artificial sexual stimulators are sold.
At the hearing it developed that prior to the incident in question and unbeknownst to appellee the activities of certain girls who worked at "Nik's Fliks and Chiks" were being investigated by the Vice Squad of the City of Tucson Police Department. *185 At the same time a similar investigation was being carried on by Sgt. Kehoe of the South Tucson Police Department and Alex Dressler, a reporter for the Tucson Daily Star. This culminated in the South Tucson Police Department charging two of the girls with operating a bawdy house. These girls informed Sgt. Kehoe and Mr. Dressler that various police officers had been patronizing some of the girls and they were being offered the girls' "services" free of charge. The Tucson Police Department, upon being informed of these allegations, undertook its own investigation. Upon questioning, Manuela Luna told the investigators that she had sexual intercourse with the appellee at a party on June 25, 1972. When questioned about her activities at Nik's Fliks prior to the party she admitted she had acted as a prostitute and made her contacts at Nik's. The evidence introduced at the hearing showed that on June 11, 1972, Manuela Luna was arrested for offering to commit a lewd act. She was subsequently found guilty of that crime on July 17, 1972.
It was also disclosed at the hearing that appellee prior to the incident in question and earlier that evening had been on duty in a patrol car with Officer Sanders. Sanders had previously answered a prowler call on June 7, 1972 at a house on Mountain View. From his contact with the girls in the house on that occasion he came to the conclusion that the house "appeared to be a sort of a house of ill repute". Earlier in the evening of June 25, 1972, at appellee's request, Sanders and appellee went to the Mountain View address on their "lunch" break. En route, Sanders told Livingston that the house "looked like a whore house". Upon arrival, Sanders and appellee declined an invitation by the girls to enter the house, but Sgt. Livingston returned later in the evening, after duty, to attend a party.
Appellee admitted that he was wearing the pants from his uniform at the party. He also admitted that he knew Manuela Luna worked at Nik's Fliks. His defense to the evidence was that he did not know that Manuela or the other girls were prostitutes; that both he and Manuela were not married and therefore their act of intercourse was not a criminal offense (adultery); and that he did not place much faith in Sanders' characterization of the house since Sanders commonly referred to girls as "whores". Chief Gilkinson's position can best be stated by reference to his testimony at the hearing:
"There is a potential for any police officer to become involved in something that eventually will lead to the officer, in official capacity, somehow being swayed to either do something or not do something on the basis of what has transpired. For any police officer to become involved with anyone who might be promiscuous, if not a prostitute, he will become vulnerable to whatever might transpire afterwards. If the officer is assigned to a sensitive position thereafter in his career, thereafter his vulnerability is obvious and he may have to repay someone a favor. Now when a man exposes himself to that possibility he is no longer a professional police officer, he thereafter can belong to anyone anyone who would want to pull that string, and frankly gentlemen, we can't afford it."
The Civil Service Commission upheld appellee's discharge and found:
"(1) That Marv D. Livingston while employed as a law enforcement officer ... associated in a non-duty capacity with a female of alleged disrepute.
(2) That Mr. Livingston engaged in an act of sexual intercourse with such a female at a party attended during his off-duty hours.
(3) That the conduct of Mr. Livingston in this regard and his association with such person, or persons, was known to employees of a local newspaper.
(4) That such conduct of Mr. Livingston was unbecoming a Police Officer, either while on or off duty, was detrimental to the law enforcement profession, *186 the City of Tucson Police Department, and the City of Tucson."
Appellee, by means of a special action in the superior court, challenged the ruling of the Civil Service Commission on three grounds: (1) The findings of fact entered by the Civil Service Commission do not substantiate the charges brought and are not sufficient to warrant his discharge; (2) the Civil Service Commission erroneously admitted evidence regarding prior alleged misconduct of the appellee which had not been specified in the charges; and (3) the regulation pursuant to which the appellee's termination was upheld is void because of its unconstitutional vagueness, overbreadth, and indefiniteness. The trial court after reviewing the transcript of the proceeding before the Commission, found that § 6-8.401(7) of the Regulations of the Tucson Police Department was unconstitutionally vague, indefinite, and overbroad and that therefore the Commission proceeded in excess of its jurisdiction in upholding the discharge of the appellee. The trial court further found that, with the exception of the invalidity of § 6-8.401(7), the decision of the Civil Service Commission was not arbitrary, capricious, or an abuse of discretion or an act in excess of its jurisdiction or legal authority. The court ordered the Commission to reinstate appellee and award him his back pay.
This appeal questions the conclusion of the trial court that § 6-8.401(7) suffers from constitutional infirmities. Appellee filed a cross-appeal which we shall treat as a cross-question.
In order to bring the issues involved into proper focus so that proper legal principles can be discussed, it is well to first recognize that the relationship between the City of Tucson and appellee is that of employer and employee. The laws relative to that relationship have been modified by the civil service laws, the object of which is to protect the employees and public from the spoils system. The purpose of civil service is to secure more efficient employees and thereby promote better government. Civil Service Board v. Warren, 74 Ariz. 88, 244 P.2d 1157 (1952). One of the objectives of civil service laws is to take from the appointing officer the right of arbitrary removal of an appointee. Absent such laws a public employee has no protection against suspension and removal with or without cause.
Chapter XII of the Charter of the City of Tucson creates a civil service commission and a classified service for certain city employees, officers, deputies and clerk. § 3(c) of the said chapter provides in part:
"Persons who have served through their probationary period and who have received permanent appointment in the classified service shall not be ... discharged... except for just cause, which shall not be religious or political." (Emphasis added)
Section 10-10 of the Tucson City Code in furtherance of the Charter makes further provisions relative to the discharge of persons in the classified service. It directs the Commission to adopt rules and regulations governing the classified service. Among the rules and regulations to be promulgated § 10-10(12) directs the Commission to provide a procedure for the discharge or suspension of employees for cause. This rule further states:
"The following shall constitute just cause, although enumeration thereof shall not exclude other causes, namely: Incompetence; insubordination; inattention; to duties; discourteous treatment of the public or fellow employees; violation of the ordinances of the mayor and council, the rules and regulations of the commission, and the rules and regulations of the department in which an employee is employed; absence from duty without leave; physical or mental unfitness to perform prescribed duties; excessive use of intoxicating liquors; addiction to the use of narcotics; immoral conduct; conviction of a crime involving moral turpitude; failure to pay or failure to make reasonable provision for payment of just debts due and owing; *187 and conduct, while either on or off duty, tending to cause scandal to the service. In no case shall any political or religious belief or affiliation or any indefinite or vague charges, such as for the good of the service be considered just cause." (Emphasis added)
The Chief of Police of the City of Tucson has promulgated certain rules for internal management of his department. § 6-8.401(7) of the rules prohibit "conduct unbecoming an officer while on or off duty, detrimental to the service". The manual which contains this rule also contains the following explanation of conduct unbecoming an officer:
"A police officer is the most conspicuous representative of government, and to the majority of the people he is a symbol of stability and authority upon whom they can rely. An officer's conduct is closely scrutinized; and when his actions are found to be excessive, unwarranted, or unjustified, they are criticized far more severely than comparable conduct of persons in other walks of life. Since the conduct of an officer, on or off duty, may reflect upon the Department, an officer must at all times conduct himself in a manner which does not bring discredit to himself, the Department, or the City.'"
The appellee does not contend any lack of procedural due process, but asserts that the regulation on "conduct unbecoming an officer" suffers from a lack of substantive due process. According to appellee the regulation is vague, since it does not apprise him of the standards with which he is to comply, and is overbroad, impinging upon his right of free speech and right of association.
To support his contentions on vagueness, appellee points to such cases as Sponick v. Police Department, 49 Mich. App. 162, 211 N.W.2d 674 (1973); Civil Service Commission v. Pitlock, 44 Mich. App. 410, 205 N.W.2d 293 (1973); Levy v. Parker, 478 F.2d 772 (3rd Cir.1973) and Flynn v. Giarrusso, 321 F. Supp. 1295 (E.D.La. 1971).
Levy v. Parker, supra, deals with Articles 133 and 134 of the Uniform Code of Military Justice, 10 U.S.C. §§ 933 and 934 (1959). Article 933 provides for the punishment of "conduct unbecoming an officer and a gentleman", while Article 934 proscribes, inter alia, "all disorders and neglects to the prejudice of good order and discipline in the armed forces ..." The Circuit Court's opinion in Levy was recently reversed by the United States Supreme Court in 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). The Michigan case of Sponick v. Police Department, supra, was based upon the Circuit Court's decision in Levy and upon Civil Service Commission v. Pitlock, supra. In our opinion the Levy case is inapposite to the case at hand and gives sustenance to neither party. Levy is a criminal case. The decision rests upon the fact that through tradition and custom and by judicial construction the seemingly vague Articles 133 and 134 have been narrowed to sufficiently comply with due process. Furthermore, Levy points out that Levy's misconduct was specifically recognized by one of the examples of Article 134 contained in the Manual for Courts-Martial, promulgated by the President by Executive order.
As for the other cases cited by appellee, we do not agree with them and believe that they miss the point. Our difference with appellee arises because we look not to the specific regulation but rather to the requirement of just cause. The Charter and implementing ordinances of the City of Tucson provide that a person in the classified service may be discharged for "just cause". "Just cause" means some substantial shortcoming which renders the continuance of the officer in his position detrimental to the discipline or efficiency of the service. Rogenski v. Board of Fire and Police Com'rs, 6 Ill. App.3d 604, 285 N.E.2d 230 (1972); Davenport v. Board of Fire and Police Com'rs, 2 Ill. App.3d 864, 278 N.E.2d 212 (1972). The Civil Service Commission cannot base "just cause" upon arbitrary or capricious reasons, but a finding of misconduct which justifies suspension *188 or discharge need not be predicated upon the violation of any particular rule or regulation. Asbury Park v. Department of Civil Service, 17 N.J. 419, 111 A.2d 625 (1955); Appeal of Emmons, 63 N.J. Super. 136, 164 A.2d 184 (1960); In re Gioglio, 104 N.J. Super. 88, 248 A.2d 570 (1968). A finding of misconduct may be based upon the violation of the implicit standards of good behavior imposed upon one who stands in the public eye as an upholder of that which is morally and legally correct, provided certain standards are met.
We believe the standards set forth in Carter v. United States, 132 U.S. App.D.C. 303, 407 F.2d 1238 (1968), dealing with the Universal Military Training and Service Act are appropriate to the case sub judice. The Act provides a reinstatement provision for veterans which is buttressed by the further provision that for one year after re-employment a veteran cannot be discharged from his regained job except for "cause". Since appellee is in the classified service and cannot be discharged except for "just cause", his discharge for cause may be upheld only if it meets two criteria of reasonableness: One, that it is reasonable to discharge him because of certain conduct, and the other, that he had fair notice, express or fairly implied, that such conduct would be ground for discharge. These standards comport with substantive due process when dealing with the employer-employee relationship. The very nature of this relationship makes it infeasible to spell out in detail all that conduct which will result in discharge. Meehan v. Macy, 129 U.S.App.D.C. 217, 392 F.2d 822 (1968), modified 138 U.S. App.D.C. 41, 425 F.2d 472 (1969); Phillips v. Adult Probation Dept., 491 F.2d 951 (9th Cir.1974). The pivotal question on the issue of fair notice is whether the conduct was or should have been known by him to be prohibited by the employer. As is said in Carter v. United States, supra:
"That knowledge may, of course, rest on fair implication, even though not made express, as in the kind of job-related misbehavior that is inconsistent with proper attention to work or proper loyalty to the employment relationship." 407 F.2d at 1246 [Footnote omitted].
This standard is an objective one. Would the reasonable police officer under the circumstances know that his conduct was prohibited? We do not think there can be any doubt in this case that the answer would have to be in the affirmative. We hasten to point out that this is not a simple case of a discreet liaison between two consenting unmarried adults, as appellee would have us believe, but rather conduct on the part of a policeman which cannot and should not be condoned.
The facts elicited at the hearing demonstrated a rational basis for the Commission's conclusion that appellee's acts were detrimental to the police department and to the City of Tucson justifying discharge. See, Norton v. Macy, 135 U.S.App.D.C. 214, 417 F.2d 1161 (1969).
In view of our approach to this case the question of overbreadth of the regulation is irrelevant.
The appellee asserts two cross-questions. In essence both questions are the same. He contends that the findings as made by the Commission do not justify dismissal. Rule 12, § 4(d) of the Rules and Regulations of the Civil Service Commission provides that the decision of the Commission "... shall consist of written findings of fact and its order for the disposition of the case."
Requiring findings of basic facts by an administrative agency assures more careful administrative consideration, protects against careless and arbitrary action, assists parties in planning their cases for rehearing and judicial review and keeps such agencies within their jurisdiction. Kansas Public Service Co. v. Corp. Comm., 199 Kan. 736, 433 P.2d 572 (1967); 2 K. Davis, Administrative Law Treatise § 16.05 (1958).
The facts which are required to be found are basic facts. These are the *189 facts upon which the ultimate finding rests. Basic facts are more detailed than the ultimate facts but less detailed than a summary of the evidence. Findings based on the evidence must embrace the basic facts which are needed to sustain the order. Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936). "The findings need not take any particular form so long as they fairly disclose ... the basic facts upon which the board relies and its ultimate conclusions therefrom within the limits of the controlling statutory provisions and standards." Pennsylvania R. Co. v. Department of Public Utilities, 14 N.J. 411, 436, 102 A.2d 618, 631 (1954).
There is no doubt that the findings in the case at bench are poorly done, but we do not believe this to be fatal. The evidence concerning the association with Manuela Luna which gives grounds for discharge was either undisputed or admitted by the appellee. In particular it is either undisputed or admitted that Nik's Fliks is a "porno house"; that appellee knew it was a "porno house"; that appellee knew Manuela Luna worked at Nik's Fliks; that appellee had previously been in Nik's Fliks on routine patrol; that appellee had seen the other girls in the house at which the party occurred at Nik's Fliks; that Officer Sanders told appellee the house at which the party occurred looked like a whore house; that the girls at the Mountain View house knew appellee was a police officer; that Manuela Luna, prior to the incident, was working out of Nik's Fliks as a prostitute; and that appellee did have sexual intercourse with Manuela Luna at the time and place stated in the charges.
Since these foregoing facts are not in dispute and are obvious upon a reading of the record and since the Commission conducted a full hearing and sustained the appointing officer's discharge on the basis of appellee's misconduct with Manuela Luna, there is a presumption that the existence of the necessary facts was ascertained and found. Swars v. Council of Vallejo, 33 Cal.2d 867, 206 P.2d 355 (1949).
The judgment is reversed and the trial court is directed to enter its order affirming the action of the Civil Service Commission of the City of Tucson.
HATHAWAY, C.J., and KRUCKER, J., concur.