Merrimack
No. 82-502

JAMES F. BLAKE

v.

TOWN OF PITTSFIELD

February 29, 1984

556

558

*Peter J. Leahy*, of Concord, by brief and orally, for the plaintiff.

*Branch & Greenhalge P.A.*, and *Upton, Sanders & Smith*, of Concord (*Frederic T. Greenhalge* and *Richard F. Upton* on the brief, and *Mr. Upton* orally), for the defendant.

*Barton L. Mayer*, of Concord, by brief for the New Hampshire Municipal Association, as amicus curiae.

BROCK, J. The selectmen of the defendant Town of Pittsfield dismissed the plaintiff from his position as chief of police on January 13, 1982. Pursuant to RSA 105:2-a, the plaintiff petitioned the superior court for a hearing on the merits and reasonableness of the action, and also requested a temporary order reinstating him as chief. After a hearing, the Superior Court (*Souter*, J.), concluding that the dismissal was probably proper, denied the request for temporary reinstatement. A hearing was held before a Master (*Walter L. Murphy*, Esq.), who recommended that the plaintiff be reinstated and awarded back pay and costs, including reasonable attorney's fees. The Trial Court (*Nadeau*, J.) approved the recommendation and entered an order accordingly. Because the master used an incorrect standard in his analysis of what constitutes removal "for cause," we reverse.

The plaintiff joined the Pittsfield Police Department in December 1977, after 20 years of service in the military and a few months employment as a security guard. At that time, the department consisted of a chief, one other full-time officer (the plaintiff), and several part-time officers. When the incumbent chief resigned in 1978, the plaintiff was appointed to fill that position, assuming the duties of chief in December of that year. While the plaintiff had attended a 4-6 week training program dealing with the routine duties of a police officer, he had never received any formal training in the duties of a police chief.

Because Pittsfield had adopted the Municipal Budget Law, RSA chapter 32, one of the plaintiff's duties as chief was to prepare a statement of estimated expenses and receipts for the police department and submit it to the town budget committee. RSA 32:5 (Supp. 1983). That same law prohibited the plaintiff, once the town meeting

had voted to appropriate funds for his department, to "pay or agree to pay any money or incur any liability involving the expenditure of money for any purpose for which an appropriation ha[d] not been made . . . ." RSA 32:10 (since amended by Laws 1981, 577:1). Nevertheless, the master found that the police department budget showed deficits of $2,288, $6,293, and $5,094.47 for the years 1979, 1980, and 1981, respectively.

During 1979 and 1980, the selectmen "on various occasions expressed their concern about fiscal restraints [to the plaintiff] and requested that he try to stay within the budget as near as possible." Master's Report, p. 2. The master evidently credited the plaintiff's testimony that he believed the budget to be only a "rough approximation" of the limitations on his spending authority, until he was specifically informed otherwise in September 1981.

In March 1981, the Pittsfield budget committee recommended to the town meeting a police department budget with a total appropriation of $48,981. At the town meeting on March 10, 1981, the voters approved an article, proposed by the plaintiff, authorizing the selectmen to hire another full-time police officer for the remainder of the year, and appropriating $7,000 for that purpose. The voters also approved the addition of $7,000 to the total appropriation for the town, which already included the $48,981 for the police department recommended by the budget committee. The plaintiff had assured the meeting that the use of part-time officers would be "reduced" if a new full-time officer was hired.

During the ensuing weeks, the selectmen's repeated efforts to elicit information from the plaintiff on the extent of the promised reduction in the use of part-time officers were unsuccessful. On May 27, 1981, the selectmen wrote the chief and expressed their concern over his lack of cooperation and general performance, stating among other things that "the Selectmen must do everything in its [sic] power to control costs and be certain that the department heads live within their appropriation." They further stated: "if you desire to continue as the Chief of Police of Pittsfield, we expect that you will comply with all the rules and would commence by preparing for us a document showing exactly what you anticipate for expenditures for the balance of the year."

On June 16, 1981, the selectmen voted unanimously not to hire a new full-time officer, and informed the plaintiff of that decision. On July 10, the plaintiff wrote the selectmen asking them to transfer to the part-time officer account some "$6,159 appropriated in the . . . [f]ull-time officer account that will not be used because of your decision." He further stated that "[d]isapproval will cause an immediate

curtailment of required services . . . ." At their July 15 meeting, the selectmen denied the plaintiff's request "because the funds were raised for a specific purpose." They denied a similar request on July 22.

On August 20, the selectmen sent the plaintiff a set of specific rules on personnel policy that drastically reduced the hours to be worked by both full-time and part-time officers. On September 2, they wrote the plaintiff again, pointing out (1) that none of the $7,000 appropriated for the new officer could be spent because no officer would be hired; (2) that the part-time officer account had already been overspent by $1,155.98; (3) that "all other accounts have marginal balances"; (4) that the total police department budget was $48,981; and (5) that the selectmen would "not tolerate such a gross overexpenditure in the 1981 budget as in the 1980 budget . . . ." Only after receiving this letter did the plaintiff reduce his rate of expenditure for part-time officers.

At the end of 1981, the police department budget had been overspent by $5,094.47. On January 13, 1982, the selectmen notified the plaintiff that he would be dismissed, citing his overspending over a three-year period and his alleged failure to comply with the selectmen's instructions in their letters of May 27, August 20, and September 2, 1981. Two other specifications were given, but were found not proven and are not germane to this appeal.

RSA 105:2-a provides in pertinent part that a police chief appointed by selectmen "shall be subject to . . . dismissal only for cause . . . . Upon such . . . dismissal, he shall be entitled to a hearing, on the merits and reasonableness of the action, in superior court . . . . The court shall have the power to affirm, modify or negate such . . . dismissal, based upon its findings."

██ ██ In his report, the master properly noted this court's holding that the words "for cause" imply "'some substantial cause, such as corruption or inefficiency in office, infraction of the rules governing the police force, the commission of an infamous crime, or the conviction of a misdemeanor and sentence to imprisonment for a term.'" *Ingersoll v. Williams*, 118 N.H. 135, 137, 383 A.2d 1119, 1120 (1978) (quoting *Gibbs v. Manchester*, 73 N.H. 265, 267, 61 A. 128, 129 (1905)). "[S]uch cause 'must be one which specially relates to and affects the administration of the office, and must be restricted to something of a substantial nature directly affecting the rights and interests of the public,' before a removal is justified." *State ex rel. Rockwell v. State Board of Education*, 213 Minn. 184, 197, 6 N.W.2d 251, 260 (1942) (quoting *State ex rel. Hart v. Common Council*, 53 Minn. 238, 244, 55 N.W. 118, 120 (1893)).

The plaintiff conceded that he had overspent his budget for 1979 and 1980, and the master found that the plaintiff had also overspent his 1981 budget, if in fact the $7,000 appropriated for a new full-time officer was properly excluded from that budget. However, the master recommended reinstatement because "no specific instances of mismanagement, incompetency or inefficiency were satisfactorily proven, especially those of such grievous nature as would appear to satisfy the *Ingersoll* standards for removal for cause." Master's Report, pp. 2–3.

The bases for this determination were evidently (1) the plaintiff's testimony that, in the master's words, "no specific instructions were given him regarding staying within the authorized budget until 1981"; and (2) the plaintiff's claimed confusion, until September 2, 1981, about his authority to spend the extra $7,000 appropriated by the town meeting.

The plaintiff argues in his brief that the master's ruling should be upheld because "[p]laintiff's conduct in overspending his budget was not such as . . . to lead any reasonable person to the belief that it would lead to dismissal." He cites *Civil Service Commission of the City of Tucson v. Livingston*, 22 Ariz. App. 183, 525 P.2d 949 (1974), *cert. denied*, 421 U.S. 951 (1975), for the proposition that, in the plaintiff's words, "the Town must give the chief fair notice, either express or implied, that [overspending of the budget] will be considered grounds for dismissal." *See id.* at 188, 525 P.2d at 954.

■■ We agree that some form of express or implied notice is required. However, notice in this case was given by the provisions of RSA 32:10, prohibiting the expenditure of unappropriated funds, and RSA 32:11, providing that violation of the statute is a ground for removal from office. We need not adopt a general rule that "[n]either ignorance of the law nor good faith is a defense to proceedings to remove a public officer." 63 AM. JUR. 2d *Public Officers and Employees* § 204 (1972) (citing *State ex rel. Rowe v. District Court et al.*, 44 Mont. 318, 325, 119 P. 1103, 1107 (1911)). Our holding that the statute constituted notice in this case is based on our previous construction of the Municipal Budget Law, other statutes dealing with the expenditure of public funds, and the fact that one choosing to spend public money should apprise himself of how to do so properly.

■■ Those laws were intended "to establish some uniformity in the manner of appropriating and expending public moneys in the various municipalities of the State . . . and to establish the safe ceiling on the total indebtedness beyond which a municipality could not expend money." *Ashley v. School Dist.*, 111 N.H. 54, 56–57, 274 A.2d

795, 797 (1971). Such goals cannot be achieved by permitting public officials to plead ignorance of the laws governing their spending authority. "'If statutes protecting public funds are to have any effect and force they should not be emasculated by judicial interpretation and relaxation of their provisions.'" *State v. Kimball,* 96 N.H. 377, 383, 77 A.2d 115, 121 (1950) (quoting *Alexander v. Ritchie,* 132 W. Va. 865, 874, 53 S.E.2d 735, 740 (1949)).

The West Virginia Supreme Court of Appeals, in affirming the removal from office of a mayor and certain city councilmen for spending unappropriated public funds, held that such officials have a duty to "'exercise ordinary diligence to keep informed of the condition of funds subject to their disposal.'" *Edwards v. Hylbert,* 146 W. Va. 1, 16, 118 S.E.2d 347, 355 (1960) (quoting *Ball v. Toler,* 109 W. Va. 61, syllabus, 153 S.E. 238 (1930)). If any lesser standard were applied here, it would defeat the above-stated purposes of the Municipal Budget Law, and encourage inefficiency by shielding from removal those officials who remain unjustifiably ignorant of their actual spending authority. Ordinary diligence in this context, absent extraordinary circumstances not evident here, requires more than a reliance on second-hand, unofficial reports. The public official "must not rely on indirect information when direct information is at hand. . . . He cannot avoid statutory restrictions on the ground of ignorance which results from his own inattention." *Ball v. Toler, supra* at 63, 153 S.E. at 239.

This is not a case in which the plaintiff's strict adherence to the provisions of RSA 32:10 would have led to a violation of some other statutory or common-law duty, as where a sudden emergency required the expenditure of unappropriated funds in order to protect the public safety. Such expenditures may be authorized after the fact, either through the selectmen's general power to transfer unexpended funds from some accounts to cover deficits in others, RSA 32:10, III (Supp. 1983), or, where an overexpenditure of the entire town budget may result, through the emergency provisions of RSA 32:10-a (Supp. 1983). In any case, a reasonable, good faith belief that such an emergency exists may bring a technical violation of RSA 32:10 (Supp. 1983) outside the *Ingersoll* standard of "substantial cause."

No such emergency is alleged to have existed in this case. The master's reliance on plaintiff's good faith was accordingly improper. RSA 32:11, noted above, is sufficient in itself to show that a violation of RSA 32:10 can in some circumstances constitute grounds for removal under RSA 105:2-a, as construed by *Ingersoll.*

The master found such a violation when he granted the defendant's requests for findings of fact to the effect that the plaintiff was the head of an "expending agency" under RSA 32:10 and was thus directly responsible for the police department's overspending in 1979, 1980, and 1981.

This finding was directly contradictory to the master's action in granting the plaintiff's request for a finding that he (the plaintiff) had "carried out his duties in a lawful manner from December 1978 until January 1982." The latter finding is not supported by the record. Nor is there any support for the master's finding that "the Town voted to add the $7,000 [for a new full-time officer] to the general police budget . . . ." Master's Report, p. 2. The record leaves no doubt that, while the $7,000 was added to the general appropriation for the whole *town*, its use was restricted to the purpose specified in the article voted on by the town meeting—hiring a full-time officer. Use of the money for other purposes, inside or outside the police department, could have been authorized only by the selectmen prior to November 27, 1981, *see generally Board of Selectmen v. School Board*, 113 N.H. 598, 311 A.2d 124 (1973); after that date not even the selectmen could authorize other uses, RSA 32:10, IV (Supp. 1983).

Knowledge of these statutes was chargeable to a public official in the exercise of ordinary diligence. Thus, we need not decide whether the evidence—including the plaintiff's letter of July 10, 1981, quoted above, and the testimony of two police officers that the plaintiff on July 15, 1981, had declared his intention to spend the $7,000 in defiance of the selectmen's refusal to transfer the funds—compels a finding that the plaintiff was in fact aware of the statutory limits on his spending authority. Absent the excuse of emergency or conflicts with his other legal duties, the plaintiff's demonstrated violations of RSA 32:10 were sufficient to satisfy the *Ingersoll* standard, if they were "substantial" as that term is used in *Ingersoll.* "Neither good faith, where no discretion is granted, nor reliance upon unauthorized practice, can relieve the [plaintiff] of liability for his failure to observe duties expressly prescribed by law." *State v. Kimball*, 96 N.H. at 383, 77 A.2d at 121.

In removal actions under RSA 105:2-a, the chief (the plaintiff here) has the ultimate burden of proving that the grounds given by the selectmen for his removal did not constitute "substantial cause." *Ingersoll v. Williams*, 118 N.H. at 140, 383 A.2d at 1122. As we have already noted, it may be possible for a chief technically in violation of RSA 32:10 (Supp. 1983) to carry this burden by show-

ing that he reasonably believed an overexpenditure was necessary to deal with an emergency or to meet a conflicting legal obligation. Further, the "substantial" nature of an overexpenditure may depend on past practice of the selectmen in dealing with budget overruns, as well as on the relative size of the overexpenditure itself.

 Thus, we do not hold that a violation of RSA 32:10 (Supp. 1983) will, of itself, automatically constitute cause for removal under *Ingersoll*; that determination will depend on the facts and circumstances of each case. In this case, however, the plaintiff amassed deficits totalling some $13,675.47 over a period of three years, in a town of only about 2,800 people. He did so despite repeated admonitions to stay within his appropriation, despite the selectmen's letter of May 27, 1981, warning him that his job was in danger, and despite their explicit refusal to authorize expenditure of the $7,000 appropriated for a new full-time officer. No reasonable trier of fact could find that the plaintiff had carried his burden of proving that his removal was not based on substantial cause. Accordingly, we vacate the decree of the superior court and dismiss the petition of the plaintiff.

*Judgment for the defendant.*

SOUTER, J., did not sit; the others concurred.